**SO ORDERED.**

**SIGNED this 06 day of May, 2009.**



_____
**ROBERT E. NUGENT**
**UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

OPINION DESIGNATED FOR ON - LINE PUBLICATION
BUT NOT PRINT PUBLICATION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| JAY DARCY SENGER, | ) | Case No. 08-11621 |
| JEANINE MARIE SENGER, | ) | Chapter 13 |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| FARMWAY CREDIT UNION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adversary No. 08-5216 |
| | ) | |
| JAY DARCY SENGER, | ) | |
| JEANINE MARIE SENGER, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**MEMORANDUM OPINION**

-1-

This case came on for evidentiary hearing on the chapter 13 trustee's objection to confirmation,[1] Farmway Credit Union's complaint to impress a lien or constructive trust on debtors' vehicle purchased post-petition – a 2000 Pontiac Grand Am,[2] and Farmway Credit Union's motion for a temporary restraining order ("TRO") against the Pontiac.[3] Laurie B. Williams, the chapter 13 trustee, appeared by her attorney Chris Micale. Debtors appeared in person and by their attorney David Lund. Farmway Credit Union ("Farmway") appeared by its attorney Eric Bruce. All exhibits of the parties were admitted by stipulation.

All of these matters center on debtor Jay Senger's post-petition receipt of a $10,000 enlistment bonus as a result of his pre-petition enlistment in the United States Army Reserves, and his purchase of the 2000 Pontiac Grand Am with the enlistment bonus. At trial, and in its trial brief, Farmway appears to abandon its requests that a lien be imposed against the Pontiac in favor of Farmway by way of its adversary complaint, constructive trust, or TRO, conceding that such a lien, if appropriate, belongs to the trustee as a hypothetical lien creditor under 11 U.S.C. § 544(a), since Farmway held no security interest or rights in the enlistment bonus.[4] Farmway held a secured claim on another of debtors' vehicle, a 1999 Plymouth Grand Voyager, and disputes debtors' valuation of this vehicle in its plan treatment. These concessions narrow the issues here to whether the

---

[1] No. 08-11621, Dkt. 18. The trustee objected on the ground that the plan did not pay debtors' monthly disposable income as required by 11 U.S.C. § 1325(b). Farmway Credit Union also objected to confirmation under 11 U.S.C. § 1325(a)(5)(B)(ii), contending that debtors were not paying the value of its collateral. *See* Dkt. 16.

[2] Adv. No. 08-5216, Dkt. 1.

[3] Adv. No. 08-5216, Dkt. 12. The request for a TRO appears to duplicate Farmway's adversary complaint in that it seeks to impose a lien against the Pontiac.

[4] Dkt. 22.

enlistment bonus was property of the estate and the manner in which the bonus should be treated or accounted for in debtors' plan of reorganization. In short, this case comes down to confirmation issues: whether the enlistment bonus must be included as property of the estate,[5] whether debtors' plan passes muster under a liquidation analysis if the bonus is included,[6] whether debtors' plan pays all of debtors' projected disposable income to unsecured creditors,[7] and the value of Farmway's collateral, the 1999 Plymouth Grand Voyager.[8]

Factual Background

The facts are largely undisputed. Debtors filed their chapter 13 petition on July 7, 2008.[9] Official Form B22C shows that debtors are below median income. The trustee does not contest debtors' calculation of current monthly income (CMI) on Form B22C. Mr. Senger has been employed at Sunflower Manufacturing, a division of AGCO, since April of 2008. He earns $10.15 per hour; in January of 2009, he received a $.60 raise. On Schedule I, Mr. Senger listed monthly income of $100 from the National Guard Army Reserve. Mrs. Senger works part-time for a kennel, Belden Farms, and also draws social security disability. Her disability may preclude her from working during the life of the plan. Debtors listed a single vehicle, a 1999 Plymouth Grand Voyager, exempt. It was scheduled with a value of $2,000 and is secured to Farmway with a claim

---

[5] § 541(a) and § 1306.

[6] § 1325(a)(4).

[7] § 1325(b)(1)(B).

[8] § 1325(a)(5)(B).

[9] Prior to this bankruptcy, debtors filed a chapter 7 case October 26, 2000 and received a discharge on August 27, 2001. On April 27, 2007, debtors filed a chapter 13 case. Confirmation of a chapter 13 plan was denied and the case was dismissed for debtors' inability to make plan payments on November 13, 2007.

-3-

of $12,843.

Prior to filing, on October 21, 2007, Mr. Senger enlisted in the Army Reserves, making a six-year commitment of service. As a result of his enlistment, Mr. Senger was eligible for an enlistment bonus totaling $20,000. The bonus was payable in three increments of $10,000, $5,000 and $5,000 upon the satisfaction of certain conditions.[10] The first bonus amount was payable upon completion of basic training. The second bonus installment was to be received the second year of his enlistment and the third and final bonus installment was to be received upon completion of the fourth year of his enlistment. Mr. Senger completed basic training on April 15, 2008, prior to filing bankruptcy but did not receive his first bonus installment of $10,000 until August 4, 2008, approximately one month after debtors filed bankruptcy.[11] After taxes, Mr. Senger netted approximately $7,000 of the $10,000 bonus. All of this amount was used to purchase a second vehicle - a 2000 Pontiac Grand Am.

Mr. Senger is currently assigned to the 425th National Guard Army Reserve Unit in Salina and his reserve duties are as a truck driver. He has reserve duty one weekend each month, for which he receives $170, and two weeks during the summer, for which he receives $1,000. He indicated that he is likely to be deployed to Iraq or Afghanistan. According to Mr. Senger, he expects to receive the second installment of $5,000 in August 2009 and the final installment in August 2011, subject to completion of his service time.

---

[10] *See* 37 U.S.C. § 309; Army Regulation 135-7, § 2-2.c.(1)(a) and (2) (April 15, 1996).

[11] Even though Mr. Senger had completed his basic training prior to filing bankruptcy and was anticipating receipt of the first $10,000 bonus, he did not disclose this expectancy anywhere in his bankruptcy schedules. *See* Ex. 3 and 5. He was, however, forthcoming about the enlistment bonus at the meeting of creditors.

-4-

Debtors' chapter 13 plan dated July 7, 2008 provides for debtors to make monthly plan payments of $150 for a period of 36 months.[12] The trustee indicated that this plan would pay a 3% dividend to general unsecured creditors. Debtors propose to cram down Farmway's claim secured by the 1999 Plymouth to a value of $2,000 and pay $75 each month.[13] According to Mr. Senger, the value of the 1999 Plymouth was derived from the Kelly Blue Book and was based upon the vehicle's poor condition. It has approximately 150,000 miles on it and the struts need to be replaced.

Farmway retained Charles Carver, the operator of Pride Autoplaza in Derby to appraise the 1999 Plymouth.[14] He valued it at $3,400 in August of 2008. Carver indicated that the need for strut repairs would further reduce the value of the vehicle, but was unable to place a figure on it.

Debtors' plan does not take into account any of the enlistment bonus Mr. Senger has received and anticipates receiving during the life of the plan. Because of the varying dollar amount of the bonus installments and the uneven payments over a period of time, the trustee has proposed, and debtors have agreed, that debtors extend their plan, from 36 months to 60 months to account for the $10,000 enlistment bonus Mr. Senger received and include it in disposable income, rather than pursue a lien against the purchased vehicle. Plan payments total $9,000 with this extended term. Debtors contend that, with this modification, the plan represents their best effort, is proposed in good faith, and is confirmable. This modification would increase the dividend to unsecured creditors to

---

[12] This figure is derived from Schedule I and J. Because debtors are below-median income debtors, their required applicable commitment period is 36 months rather than 60 months. *See* § 1322(d)(2), § 1325(b)(1)(B) and (b)(4).

[13] The 1999 Plymouth is a non-910 car loan.

[14] On cross-examination, the trustee attempted to impeach Carver's credibility by showing that Farmway's counsel also performs legal work for Pride AutoPlaza and had previously represented Carver in his personal bankruptcy in 2005, taking a security interest in Carver's income tax refunds for his attorney fee.

Case 08-05216    Doc# 24    Filed 05/06/09    Page 5 of 13

16%, some $3,900.[15]

Analysis

A.   The Enlistment Bonus

The Court first addresses whether the enlistment bonus of $10,000 is property of the estate and must be included in the disposable income calculation.[16] If so, debtors must satisfy the liquidation test of § 1325(a)(4). The Court concludes that the $10,000 bonus received by Mr. Senger post-petition was property of the estate. Section 541(a)(1) includes in property of the estate "all legal or equitable interests of the debtor in property as of the commencement of the case." At the time the debtors filed their bankruptcy case, Mr. Senger had completed his training and had satisfied the condition for payment of the first installment of the enlistment bonus. Thus, the Court concludes that Mr. Senger had, at a minimum, an equitable interest in the $10,000 bonus, even though he had yet to physically receive it when he filed his case.[17]

Even if Mr. Senger had not qualified for the bonus at the time of his filing, the Court concludes that his contingent interest in the enlistment bonus constitutes property of the estate. The Court notes that the post-petition bonus was sufficiently rooted in his prepetition past to be included in property of the estate because it was based upon Mr. Senger's prepetition enlistment, even though

---

[15] *See* Trustee's Ex. C.

[16] 11 U.S.C. § 1325(b)(1)(B).

[17] *Cf. Kelly v. United States Air Force (In re Kelly),* 88 B.R. 477 (Bankr. M.D. Ga. 1988) (Chapter 7 case where Air Force's action in withholding from debtor's final paycheck a percentage of re-enlistment bonus to recoup bonus due to debtor's discharge from Air Force for misconduct was not a stay violation; debt was post-petition debt where debtor's discharge notice and actual discharge occurred after debtor filed bankruptcy petition); *In re Haynes,* 679 F.2d 718 (7th Cir. 1982) (Chapter 7 debtor's naval retirement pay was not property of the estate because conditions imposed for receipt of retirement pay made the retirement pay proceeds for services performed post-petition under § 541(a)(6)).

-6-

the enlistment bonus was contingent upon satisfying certain conditions for Mr. Senger to be entitled to it.[18] The federal statute and regulations authorizing the payment of the enlistment bonus also existed pre-petition.

In addition, § 1306 further modifies § 541 in a chapter 13 case. Property of the estate in a chapter 13 case additionally includes "all property of the kind specified in [§ 541] that the debtor acquires after commencement of the case . . ."[19] and earnings for services performed after commencement of the case.[20] Here, debtor acquired the $10,000 bonus when he received it on August 4, 2008, approximately one month after filing bankruptcy. It constitutes property of the estate under § 1306 and must be included in the disposable income calculation under § 1325(b)(1)(B).[21]

With this conclusion, the Court must satisfy itself that the $10,000 bonus passes scrutiny under the liquidation analysis of § 1325(a)(4). The Court concludes that it does not, even with the trustee and debtor's proposed plan modification and extension of the plan term to 60 months "to account" for this bonus. As noted above, the trustee represents that unsecured creditors would receive $3,900 with this modification. Of the $10,000 gross bonus amount, debtors received $7,000 net of taxes. Reducing this amount for the costs of liquidation (chapter 7 fees and expenses) by an

---

[18] *See Segal v. Rochelle,* 382 U.S. 375, 380, 86 S.Ct. 511. 15 L.Ed. 2d 428 (1966) (Bankruptcy Act case where tax loss-carryback refund claim was "sufficiently rooted in the pre-bankruptcy past" to be regarded as property under the Act); *Booth v. Vaughan (In re Booth),* 260 B.R. 281 (6th Cir. BAP 2001) (noting an array of varying circumstances and cases where a debtor's contingent interest is property of the estate)

[19] § 1306(a)(1)

[20] § 1306(a)(2)

[21] *See In re Foster*, 2006 WL 2621080 (Bankr. N.D. Ind. 2006).

-7-

estimated $2,000 leaves an amount of $5,000. To satisfy the liquidation analysis, debtors must modify their plan to pay unsecured creditors $5,000, rather than the $3,900 currently proposed. Since debtors' plan term has already been extended to the maximum of 60 months, they must increase their plan payment to pay a minimum of $5,000 to unsecured creditors.

Determining the impact of the two remaining future bonus installments on debtors' projected disposable income is more problematic. If Mr. Senger meets the conditions for their payment, he would receive $5,000 in August of 2009 and $5,000 in August of 2011, during the life of the plan. The difficulty here is converting these lump sum bonus amounts to a monthly income figure. A straight division of these sums over the remaining months in the plan term calculates to approximately $104 per month for the August 2009 installment ($5,000 over 48 months) and an additional $208 per month for the August 2011 installment ($5,000 over final 24 months of plan). This straight division does not account for (1) the discount for payments to be received in the future; (2) the taxes to be withheld from the payments; or (3) the possibility, however slim, that Senger does not qualify for these bonuses going forward. The Court must discount these bonuses because they are contingent and are sums to be received in the future over only a portion of the plan term.[22]

These debtors are below-median income debtors and the calculation of their projected disposable income differs from above-median income debtors.[23] The Tenth Circuit held in *Lanning*

---

[22] Indeed, the Court questions whether the final bonus increment would have to be included in the projected disposable income calculation at all, since debtors were only legally required to submit their projected disposable income over a 36 month applicable commitment period.

[23] The starting point for calculation of projected disposable income with respect to the income side for above median-income debtors is Form B22C. *In re Lanning*, 545 F.3d 1269, 1270, 1272 n.2 (10th Cir. 2008). *See also, In re Lanning*, 380 B.R. 17, 21 (10th Cir. BAP 2007) (Above median income debtors are required to use standardized deductions, § 1325(b)(3), as

-8-

that bankruptcy courts should start with debtors' current monthly income as defined in § 101(10A) for the income side of the disposable income equation and did not directly speak to the expense side of the equation.[24] Most courts, however, use Schedule J expenses for below median income debtors based upon § 1325(b)(2)(A).[25] Here, the disagreement centers on the income side of the projected disposable income calculation and the omission of the enlistment bonuses to be received in the future from Schedule I.[26] While Mrs. Senger lists her monthly social security disability payments of $751 on Schedule I, such social security income is excluded from her current monthly income calculation under § 101(10A) and Form B22C.[27] In addition, the calculation of current monthly

---

determined on Form B22C, rather than Schedule J.); *In re Kibbe*, 361 B.R. 302, 306 n. 3 (Below-median income debtors utilize Schedule J monthly expenses for determining disposable income, § 1325(b)(2)(A)).

[24] 545 F.3d 1269 (10th Cir. 2008). *Lanning* was an *above median income* debtor case, and it did not directly address the expense side of the disposable income calculation other than to note that expenses were determined by using the means test expenses pursuant to § 1325(b)(3). *Id.* at 1272 n. 2. *Kibbe*, a *below median income* debtor case where the court reached the same forward looking approach on the income side, noted that expenses were determined by Schedule J pursuant to § 1325(b)(2)(A). 361 B.R. at 306 n. 3 *See also* § 1325(b)(2) defining "disposable income."

[25] *See In re Rush,* 387 B.R. 26 (Bankr. W.D. Mo. 2008); *In re Fuller,* 346 B.R. 472, 483 (Bankr. S.D. Ill. 2006); *In re Daniel,* 359 B.R. 320 (Bankr. D. Kan. 2006); *In re Girodes*, 350 B.R. 31, 37 (Bankr. M.D.N.C. 2006).

[26] The Court notes that these bonus installments would not have been included in the calculation of debtors' current monthly income under § 101(10A)'s CMI definition and Form B22C, because they had not been *received* during and *derived* from the six-month period prior to filing. *See* Keith M. Lundin, 6 CHAPTER 13 BANKRUPTCY 3D ED., § 468.1 at 468-12 (2000 & Supp. 2007-1). The treatment of these future bonus amounts for calculating projected disposable income becomes relevant only if the Court departs from the CMI calculation on Form B22C, in which event, the Court would essentially be adding them or considering them on debtors' Schedule I.

[27] *See In re Rush, supra; In re Upton*, 363 B.R. 528 (Bankr. S.D. Ohio 2007); *In re Barfknecht*, 378 B.R. 154 (Bankr. W.D. Tex. 2007). *See also*, Keith M. Lundin, 6 CHAPTER 13 BANKRUPTCY, 3D ED., § 468.1 at 468-26 (2000 and Supp. 2007-1).

-9-

income on Form B22C is a gross figure and does not take into account payroll taxes and social security as does Schedule I.[28] In short, the Court concludes that adding in the remaining two enlistment bonus installments to be received over the life of the plan, but backing Mrs. Senger's social security income and the debtors' payroll deductions and taxes out of current monthly income, and discounting the future payments, essentially results in a "wash."[29] The Court is therefore satisfied that debtors' Schedule I (which includes Mrs. Senger's social security benefit) and J, accurately represent their monthly projected disposable income of $150.

The Court has considered the somewhat analogous case of *In re Foster*[30] as further limited support for the result it reaches today. Although the case involves above-median debtors, it addresses the issue of whether future annual bonuses debtor expects to receive during the life of the 5-year plan must be included in projected disposable income. In *Foster*, because of the timing of their bankruptcy petition, no annual bonus was included in CMI.[31] On Schedule I, debtors included the current year annual bonus of over $12,000 (divided into monthly amounts). Further, debtors'

---

[28] *See In re Quarterman*, 342 B.R. 647,651 (Bankr. M.D. Fla. 2006) (amount of taxes paid by debtor is a reasonably necessary expense and is to be subtracted from current monthly income).

[29] The Court observes that there is only a minor variance between CMI and Schedule I income in this case. Debtors' CMI as calculated on Form B22C is $3,002.09 (without Mrs. Senger's social security income and utilizing gross, rather than net, monthly income). Schedule I monthly income is $2,956.83 (including Mrs. Senger's social security income and using net monthly income figures). If the taxes were deducted from the Form B22C gross income figure as a reasonable and necessary monthly expense on Schedule J, some $500, the disparity is even more favorable for debtors to utilize the CMI figure. On balance, the $150 disposable income is more than adequate.

[30] 2006 WL 2621080 (Bankr. N.D. Ind. Sept. 11, 2006).

[31] Debtors received a $12,000 bonus (through Mrs. Foster's employment) on February 28, 2005, but did not file their chapter 13 petition until November 30, 2005, more than the 6-month historical look back period for calculation of CMI. *Id.* at *1.

-10-

monthly expenses showed a variance of approximately $1,700 between the deductions allowed on Form B22C and Schedule J. As a result, monthly disposable income from Form B22C was some $508 while net income from Schedules I and J was some $1,239.[32] Debtors' plan filed on January 6, 2006, omitted any treatment of the current or future annual bonus and the trustee objected to confirmation, contending that the projected disposable income did not include the annual bonus and that debtors would get a $12,000 windfall in "uncommitted bonus income every year," to the detriment of their creditors. Debtors, of course, argued that the bankruptcy court could not deviate from the disposable income calculation produced by Form B22C. In siding with the trustee, the bankruptcy court adopted the forward-looking view of projected disposable income and declined to treat the CMI analysis as the ultimate measure of debtors' ability to fund their plan.[33]

Most interesting in *Foster*, however, was the bankruptcy court's theory to include the future bonuses in CMI. Referencing Judge Lundin's treatise, the bankruptcy court stated:

> . . . Judge Lundin considers the possibility that such amounts can be included in CMI under § 101(10A)(B):
>> This raises the question whether amounts paid by any entity other than the debtor on a regular basis for the household expenses of the debtor or a dependent of the debtor under § 101(10A)(B) are included in CMI even if not received by the debtor or derived within the six-month period described in §101(10A)(A). Without the temporal limitation in § 101(10A)(A), the amounts included in CMI by §101(10A)(B) could be amounts paid at any time so long as the conditions of regularity and use for household expenses are satisfied.
>> . . .
>> Imagine a chapter 13 debtor who received a tobacco or crop subsidy nine months before the Chapter 13 petition. The payment is outside the applicable six-month period in § 101(10A)(A) and would not come into CMI through that subsection. But if the debtor receives

---

[32] *Id.*

[33] *Id.* at *6.

-11-

such a payment every year and if the payment can be characterized as "for the household expenses of the debtor," the payment might be dragged into CMI by § 101(10A)(B). . . .

. . . this court finds similarities between his examples and the regularly received bonuses that were not paid within 6 months before the debtors' petition. Those bonuses were deposited in the debtors' bank account and may well have been used to pay the debtors' household expenses. At least, there is no evidence that they were not used for payments of the debtors' household expenses.[34]

In sustaining the trustee's objection, the *Foster* court concluded that projected disposable income must take into account the debtors' past and current financial status, including the annual bonuses anticipated in the future.[35] In the case at bar, the enlistment bonus increments to be received by Mr. Senger in the years 2009 and 2011 might also be included in debtors' projected disposable income.[36] Unfortunately, this Court is left to its own devices to determine the manner in which these future enlistment bonuses should be "accounted for," as neither *Foster* nor *Lanning* offer specific guidance on this front.

B.  Vehicle Valuation for Cram-down of Farmway's Claim

Debtors propose to pay a value of $2,000 on Farmway's claim secured by the 1999 Pontiac pursuant to § 1325(a)(5)(B). Apart from Mr. Senger's opinion of the value, the only other valuation evidence consisted of Farmway's appraiser's opinion of value of $3,400. The Court believes the accurate value for the vehicle is more likely somewhere in between these two figures, particularly

---

[34] *Id.* at *7-*8.

[35] As this Court reads *Lanning,* the result reached today is entirely consistent with *Lanning's* forward-looking approach to projected disposable income adopted in this Circuit.

[36] On the present record, the Court cannot conclude definitively that the enlistment bonuses meet the condition of regularity required by § 101(10A)(B). Nor is it established that the future enlistment bonuses would be used for household expenses. Like *Foster* however, there is no evidence that the enlistment bonus would not be used for payment of debtors' household expenses.

-12-

because Farmway's expert did not take into account the need for struts repairs to the vehicle. Moreover, because of Mr. Carver's close business association with Farmway's counsel, his opinion is open to some credibility questions. Because the Court knows of its own knowledge that suspension problems can be expensive to remedy and because this is a ten-year-old vehicle for which there may be a limited market, the Court concludes that the value of the 1999 Plymouth is $2,500. Because debtors' plan in its current form does not propose to pay Farmway the value of its collateral, the plan cannot be confirmed.

### Conclusion

Confirmation of debtors' current plan, or as modified by the trustee's and debtors' proposed announced oral agreement at trial, is DENIED. Debtors will be given ten (10) days to amend their plan consistent with this opinion – paying Farmway's claim in an allowed amount of $2,500 and paying to unsecured creditors the amount of $5,000 to comply with § 1325(a)(4) – or the case will be dismissed. Farmway Credit Union's adversary complaint is DISMISSED with prejudice and its motion for a temporary restraining order is DENIED.

# # #